## DOWNHAM v. CITY COUNCIL OF ALEXANDRIA.

District Court, E. D. Virginia, at Alexandria.
Jan. 6, 1932.

Charles Henry Smith, of Alexandria, Va., for complainant.

Carl L. Budwesky, of Alexandria, Va., for respondent.

WAY, District Judge.

This is a bill of complaint filed by the plaintiff, Robert F. Downham, seeking perpetually to enjoin the city council of Alexandria, a municipal corporation, and all persons claiming to act under its authority, direction, or control, to refrain from interfering with plaintiff in the erection, construction, and maintenance of a gasoline filling station on his property at the northeast corner of King street and Russell road in said city, and particularly from instituting criminal prosecutions against him under certain ordinances of said city. The bill is based upon the alleged ground that certain ordinances of the city prohibiting the use of plaintiff's property for a gasoline filling station, if upheld and enforced, will result in depriving plaintiff of his property without due process of law, contrary to the Constitution of the United States.

### Findings of Fact.

The cause came on for hearing upon the verified bill and answer, and the numerous exhibits. As the pleadings present no issue as to any essential facts, but only as to the

conclusions of law sought to be drawn from the facts as disclosed by the pleadings, the court has reached the conclusion that the taking of testimony is not necessary to a decision of the case on the merits, and therefore, from the pleadings and exhibits therewith, makes the following findings of fact:

1. Plaintiff, Robert F. Downham, is a citizen and resident of the city of Alexandria, Va., which said city is a municipal corporation existing under the laws of Virginia, and situate within the Eastern district of Virginia.

2. The amount in controversy in the case exceeds the sum and value of $3,000, exclusive of interest and costs.

3. Plaintiff is the fee-simple owner of a parcel of unimproved real estate (composed of several smaller lots or parcels which he acquired about ten years ago) situate at the northeast corner of King street and Russell road and directly across King street and about 200 feet from the passenger station of the Richmond, Fredericksburg & Potomac Railroad Company in the city of Alexandria. That station is a railroad terminal accommodating five or six railroads having connection and transportation facilities in the said city of Alexandria. The tracks of the railroad and its right of way pass within approximately one city block east of plaintiff's property. Diagonally across Russell road and approximately south from plaintiff's property lies the easterly end of the property belonging to the George Washington National Masonic Memorial Association, which property is devoted to park purposes and upon which there has been erected the George Washington National Masonic Memorial monument costing several millions of dollars. The land between the passenger station building of the railroad and Russell road is parked and beautified by flowers, shrubs, and grass plots. The land to the west (across the street) of plaintiff's property is devoted to residential purposes. There are no commercial or industrial plants or enterprises west of the Richmond, Fredericksburg & Potomac Railroad in the vicinity of plaintiff's property. A large part of the property immediately north of plaintiff's property is unimproved, but there are a number of residences lying northeast of and between his property and the right of way of the railroad. So far as any improvements exist in the vicinity of plaintiff's property they are residential, and some of the residences are nearer the railroad right of way than plaintiff's property. While the greater part of the property in the immediate vicinity of plaintiff's property is unimproved, the tendency, as indicated by such improvements as have been made in that vicinity, has been to confine its use entirely to residential purposes.

Two photographs showing plaintiff's property are filed herewith marked "A" and "B." Photograph "A" shows the property of plaintiff at close range, while the photograph "B," not only shows plaintiff's property, but all the property in the vicinity thereof. On each of these photographs plaintiff's property is indicated by "X." Plaintiff's land is unimproved and still in its natural state, except for billboards thereon advertising the property and for the paved streets (King street and Russell road) lying in front thereof.

4. Russell road and King street are highly improved highways constructed and maintained by defendant city.

5. Plaintiff's property, or certainly the greater part of it, is situate in what was developed as a restricted residential subdivision known as "Rosemont." Those restrictions placed upon the lots in "Rosemont" by the corporation or persons who developed it expired by their own limitations January 1, 1928.

6. In 1927, plaintiff applied for a permit to construct a gasoline filling station on his property. The application was refused by defendant. Plaintiff did not further press the application, although he apparently did not abandon his intention to use the property for commercial purposes. In October, 1930, he again made application for a permit to construct and maintain a gasoline filling station, but withdrew that application before the council of defendant city acted on it one way or the other.

7. By an ordinance approved November 2, 1923, defendant undertook to establish zoning districts in the city of Alexandria and to regulate the use of lands therein. That ordinance zoned the city into residence and nonresidence districts, as will appear from the following provisions of the ordinance:

"Non-residence districts shall comprise all lands which at the time this ordinance goes into effect are used for any business or industry other than farming, truck gardening, the growing of trees, shrubs, vines or plants, the raising of animals, or the conduct of a boarding or lodging house, and all lands located and fronting upon any section of any street between two successive intersecting streets, when not less than one-half of the ground floor frontage on each side of said street is devoted to any such business or in-

dustry or is manifestly intended to be so used, at the time this ordinance takes effect.

"Residence districts shall comprise all areas not included in Non-Residence Districts."

The ordinance of November 2, 1923, further provided that a permit for the erection in a residence district of a building for the purpose of any business or industry or for the alteration or conversion of a building in such district for or to such purposes should be granted if accompanied by the written consent of the owners of at least three-fourths of all the land not used for business purposes lying on the same side of the street between the two intersecting streets nearest to and on either side of the land in question or within 400 feet on either side thereof, in case there was no intersecting street, and also all lands fronting on the other side of the street and directly opposite said land, the use of which was desired to be changed, and also all lands immediately in the rear of the land proposed to be changed to other than residential purposes.

This ordinance, as will be noted, made change from residence to business purposes dependent upon the consent of a specified percentage of the residence property within a certain area.

An ordinance adopted September 22, 1927, changed this requirement from three-fourths of the lands to not less than one-half of all said lands.

On January 15, 1931, the council of defendant city adopted an ordinance termed an "interim ordinance" to be in force pending the adoption of a comprehensive zoning plan, and entitled: "An ordinance regulating the use of lands in the City of Alexandria, Virginia, pending the adoption of a comprehensive zoning ordinance for said city and prescribing penalties for violation hereof."

The purposes of Ordinance No. 104, as stated in the preamble thereof, are as follows: "Whereas it is the desire and purpose of the City Council of Alexandria, Virginia, to regulate the locations of trades and industries within the City; to limit the height and bulk of buildings erected therein; to prevent the over-crowding of land and avoid undue congestion of population and public highways; to protect and stabilize property values, and in general to promote the public health, prosperity, safety and welfare, by the adoption of an Ordinance dividing the area of the City into districts, and prescribing such suitable, appropriate and reasonable restrictions for the use of the property therein as may be necessary for said purposes."

The preamble of the ordinance also sets forth that, at the request of the city council, a zoning commission has been appointed by the corporation court of the city of Alexandria pursuant to the acts of the General Assembly of Virginia in such cases made and provided, and that it was deemed to the best interest of the public health, prosperity, safety, and welfare to regulate the use of the lands in the city of Alexandria pending the final adoption of a zoning ordinance so as to conform to the general plan then under consideration by said zoning commission. After the preamble there follows these provisions in Ordinance 104:

"Section 1. No permit for any construction other than a single dwelling and accessories thereto shall be issued by the City Council of Alexandria, without the application for such building permit being first referred to the Zoning and Planning Commission for consideration and recommendation to the Council.

"Section 2. No existing building within the City not now lawfully used for business purposes shall be altered, remodeled, or converted for business purposes without a permit from the City Council of Alexandria and no such permit shall be issued without the application for same being referred to the Zoning and Planning Commission for consideration and recommendation to the Council."

8. On July 25, 1931, some time after the institution of this suit and also after the filing of plaintiff's amended bill, defendant's council adopted a very comprehensive zoning ordinance which undertakes at length and with great detail to zone the entire city dividing it into five different zones, designated: Zones A, B, and C, residential; D, commercial; and, E, industrial.

Briefly stated, that ordinance zones plaintiff's land as class A residential, the most restricted classification under the ordinance, thereby prohibiting plaintiff, so long as said ordinance remains in force, from using his land or any part of it for commercial purposes.

9. Plaintiff has not applied for a permit to erect and maintain a gasoline filling station on his property since the enactment of Ordinance No. 104, which, as noted above, was adopted January 15, 1931. He has made no application under the ordinance of July 25, 1931, now in force; but, as stated above, his

last application to the city for a filling station permit was made and withdrawn before any action was taken thereon, in October, 1930.

10. In his amended bill, plaintiff alleges, and the court finds as a fact, that he is willing and ready to comply with the usual and ordinary regulations pertaining to the construction, maintenance, and operation of gasoline filling stations. He further alleges that he proposes to build and maintain the gasoline filling station so that it will not be unsightly or a nuisance and to give the premises architectural and landscape treatment so as to beautify and make the same as attractive to the eye as it is reasonably possible to make a gasoline filling station.

11. The property of plaintiff is, from a commercial standpoint, desirable and valuable for gasoline filling station purposes, due in large measure to the highly improved condition of King street and Russell road, the increased traffic passing the property as a result of the improvement of those streets, and to the residential and park developments above referred to in that immediate vicinity. The land is also valuable for residential purposes as indicated by the trend of developments in its vicinity.

### Memorandum and Conclusions of Law by the Court.

A careful examination of the pleadings and exhibits does not disclose a basis for any charge that plaintiff is being discriminated against, that is, that he is being denied a use of his property which is permitted to be made of other properties similarly situated in the vicinity of his property, since there is no showing that other properties in that vicinity similarly situated are or will be permitted under the ordinance to be used for gasoline filling station or other commercial or industrial purposes.

Plaintiff strongly relies on the decision of the Supreme Court of the United States in Nectow v. City of Cambridge, 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842. It appears that Nectow owned a parcel of land containing about 140,000 square feet. His land was bounded on the north and west by streets, and the lands lying on the east and south of his were left unrestricted and were being used for commercial and industrial purposes. The ordinance zoned a strip of Nectow's land about 100 feet wide, containing 29,000 square feet and fronting on the two streets, as strictly residential property, and left the remainder of his property, about 111,000 square feet, unrestricted. In other words, the 100-foot strip, apparently, was the only parcel in the entire block zoned as residential property, and the nearest residential property was separated from the 29,000 square feet by at least the width of a street. The Supreme Court held under the circumstances that the restrictions imposed upon the 29,000 square feet bore no substantial relation to the public health, morals, or welfare.

In this case we have just the reverse. If plaintiff is given the relief prayed for, he will be permitted to use his parcel of property for commercial purposes while all of the adjoining properties and all the property in that immediate vicinity is restricted to residential purposes. Here it is manifest that the restrictions complained of do bear a very real and substantial relation to the public health, safety, and welfare.

It is true that plaintiff in his bill alleges that he proposes to build and maintain the gasoline filling station so that it will not be unsightly or a nuisance and to beautify the premises by architectural and landscape treatment. The court has no doubt as to his good intention, and that he will, if permitted to construct and maintain the gasoline filling station, beautify it and make it as attractive to the eye and as free from objectionable features as it is reasonably possible to make a gasoline filling station. The court, however, is not prepared to go so far as to agree with plaintiff that it will not be a nuisance. The question whether a particular place or thing is or is not a nuisance is to be determined by considering the proposed enterprise, not abstractly, but in connection with all the circumstances of its particular locality. In Euclid v. Ambler Co., 272 U. S. 365, at 388, 47 S. Ct. 114, 118, 71 L. Ed. 303, 54 A. L. R. 1016, Mr. Justice Sutherland, speaking for the majority of the Supreme Court, said: "A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. Radice v. New York, 264 U. S. 292, 294, 44 S. Ct. 325, 68 L. Ed. 690."

Taking the view most favorable to plaintiff's contention, this court cannot say as a matter of law that the question as to how plaintiff's property should be zoned is not debatable. It is fairly debatable, and the court may not arbitrarily substitute its judgment for that of the legislative body of the city on a question so vitally affecting the public safety and welfare.

■ It does not appear to the court to be highly material, in view of plaintiff's action, or rather his failure to act, that the ordinance under which plaintiff's property was finally zoned as residential property was adopted some time after the institution of this suit. Ordinance No. 104, adopted January 15, 1931 (this suit was instituted February 17, 1931), was a reasonable temporary exercise of the police power pending the city council's final decision as to how the city should be zoned. Ordinance No. 104 did not undertake to delegate the city council's authority to pass upon applications for commercial or industrial permits. It simply provided that all applications for such permits should first be referred to the then existing zoning commission for the latter's recommendation to the council. A recommendation by the zoning commission was not binding upon the city council, but the latter was free to act as it saw fit upon each application. It was still left open to plaintiff and others to apply to the city council for permits to use their property for commercial purposes, and it must have been perfectly patent to plaintiff, after January 15, 1931, that the city was preparing with reasonable expedition to formulate and adopt a comprehensive zoning ordinance, but that it had not yet forbidden the use of his property for commercial purposes. He should have taken appropriate action then to ascertain whether the city would grant him a permit to use his property for filling station purposes before resorting to the courts. Having failed to take advantage of that opportunity, it hardly appears equitable that he should now be heard to say that Ordinance No. 104 was void, and that the ordinance of July 25, 1931, not having been adopted until after the suit was instituted, has no application to this case.

Furthermore, it seems to the court that it would be a rather strict application of the law to hold that a city, pending the necessary preliminaries and hearings incident to proper decisions upon the adoption and the terms of a zoning ordinance, cannot, in the interim, take reasonable measures temporarily to protect the public interest and welfare until an ordinance is finally adopted. Otherwise, any movement by the governing body of a city to zone would, no doubt, frequently precipitate a race of diligence between property owners, and the adoption later of the zoning ordinance would in many instances be without effect to protect residential communities—like locking the stable after the horse is stolen.

■ The conclusions of the court, therefore, are that the city council has authority to adopt reasonable measures and ordinances tending to prevent the overcrowding of the lands within the corporate limits, to prevent congestion upon the public highways and streets, and, in general, to do whatever is reasonably necessary to promote the public health, prosperity, safety, and welfare, which, under existing conditions in this country, due in large measure to the great increase in population, undoubtedly includes the adoption of reasonable measures to protect homes from the noise, smoke, dirt, odors, and dangers naturally incident to commercial and industrial activities and enterprises; that this court may not, without an unwarranted invasion of the police power of the city, an arm of the state, substitute its judgment for that of the city council as to whether it is more logical and more desirable, considering all phases of the question which the city council had to consider and pass upon, including the interests of neighboring properties and the health and safety of the public, to zone plaintiff's property as residential rather than as commercial property. This the court considers is a matter within the sound discretion of defendant's governing body acting within reasonable and proper limitations, and there is a lack of any substantial evidence to warrant the court in concluding that the city council has arbitrarily or unreasonably exercised its authority and discretion in that behalf.

It is, therefore, the conclusion of the court that the bill is without equity and must be dismissed.